Filed 4/25/13  P. v. Hidalgo CA2/4

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>ANGEL ANTHONY HIDALGO,<br><br>    Defendant and Appellant. | B236817<br>(Los Angeles County<br>Super. Ct. No.  BA360743) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Curtis B. Rappe, Judge.  Affirmed as modified and remanded with directions.

Jean Ballantine, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Paul M. Roadarmel, Jr. and William N. Frank, Deputy Attorneys General, for Plaintiff and Respondent.

Appellant Angel Anthony Hidalgo challenges his conviction for murder (Pen. Code, § 187, subd. (a)).[1] He contends his judgment of conviction must be reversed due to insufficiency of the evidence, instructional error, and sentencing error; in addition, he maintains that the trial court erred in admitting the preliminary hearing testimony of a witness not available at trial. Respondent acknowledges certain defects in appellant's sentence. Although we reject appellant's contentions regarding the sufficiency of the evidence, the prejudicial effect of any instructional error, and the admission of the preliminary hearing testimony, we conclude that his sentence contains errors, and modify the judgment to correct them.

## RELEVANT PROCEDURAL HISTORY

On July 22, 2010, an information was filed, charging appellant, along with Gabriel Demetruis Delgado and Angel Garcia, with the murder of Luis Miguel Mora.[2] The information alleged that a principal had personally used, and intentionally discharged a firearm, causing great bodily injury and death (§12022.53, subds. (b), (c), (d), (e)).[3] It further alleged that the offense was committed for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)(C)). Appellant pleaded not guilty and denied the special allegations.

---

[1] All further statutory references are to the Penal Code.

[2] The information also charged Yesenia Villarreal, who entered a plea and testified prior to trial. Delgado, Garcia, and Villarreal are not parties to this appeal.

[3] The information also contained gang and gun use allegations against Delgado and Garcia (§§ 186.22, subd. (b)(1)(C), 12022.53, subd. (b), (c), (d), (e)(1)).

Appellant was tried jointly with Delgado and Garcia. The jury found appellant guilty of willful, deliberate, and premeditated murder and found the special allegations to be true. The jury also found Delgado guilty of willful, deliberate, and premeditated murder, and found the special allegations against him to be true. The jury was unable to reach a unanimous verdict regarding Garcia, and a mistrial was declared with respect to him. The trial court sentenced appellant to a term of imprisonment of 50 years to life. In addition, the court imposed a 15-year minimum parole eligibility period (§ 186.22 (b)(1)(C)).

## FACTS

A. *Prosecution Evidence*

    1. *Background*

In August 2009, appellant, Delgado, and Garcia belonged to the Maywood Locos gang, as did Yvette Lemus. Yesenia Villarreal was an "associate" of the gang. According to Los Angeles County Sheriff's Department Deputy Sheriff Andrew Serrata, a gang expert, during the pertinent period, the Maywood Locos gang had more than 100 members, and claimed territory west of the intersection of 57th Street and Atlantic Boulevard in Maywood. A rival gang known as the "Krazy Wicked Surenos" (K.W.S.) had approximately 30 members, and claimed territory east of that intersection. Serrata opined that Maywood Locos who entered K.W.S. territory in an effort to kill a K.W.S. member earned respect within their own gang; he also opined that such a murder would be done for the gang's benefit.

Luis Mora lived in a house on 57th Street located a short distance east of Atlantic Boulevard. According to Serrata, Mora was not a documented member of any gang.

3

## 2. *Mora's Murder*

The prosecution's principal witnesses regarding appellant's role in Mora's murder were Villarreal and Lemus. Villarreal testified that on August 13, 2009, she was driving with Lemus. She picked up appellant and Delgado, who asked her to go to Garcia's house so that Delgado could retrieve his gun. After Villarreal made the stop, Garcia joined the car's occupants. Villarreal then drove to a Shell gas station on the northwest corner of Atlantic Boulevard and 57th Street, where she and Lemus entered the store to pay for gas. When they returned to the car, appellant was outside, using a cell phone. While Villarreal pumped gas, appellant pointed to a specific location on Atlantic Boulevard, and asked her to pick him up there. Appellant and Delgado then crossed the street. Garcia, who remained at the car, told Villarreal that they had "seen a dummy across the street." She understood this to mean that they had observed a K.W.S. member. Soon afterward, she heard gunshots. At Lemus's urging, Villarreal stopped pumping gas and drove to the location appellant had identified, where appellant and Delgado entered the car. As Villarreal drove away, Delgado said, "I got him," and "he fell to the floor screaming."

Lemus was determined by the trial court to be unavailable as a witness, and portions of her preliminary hearing testimony were presented to the jury. According to Lemus, on August 13, 2009, she was "cruising" in a car driven by Villarreal, who stopped to pick up appellant and Delgado. At Delgado's request, Villarreal drove to Garcia's house to permit Delgado to retrieve his gun. Delgado went into the house and returned with Garcia, who joined Lemus and the others in the car.

Villarreal then drove to the Shell station. After Villarreal parked at the gas pumps, Lemus and Villarreal walked into the station to pay for gas. When Lemus

4

and Villarreal returned to the car, Lemus heard Garcia tell Delgado, "It's a dummy," and saw Delgado look toward a Valero gas station located across Atlantic Boulevard. According to Lemus, the term "dummy" means "enemy gangster[]." Delgado then said to appellant, "You got it?" Lemus watched appellant and Delgado walk across Atlantic Boulevard. Sometime later, after Lemus heard gunshots, Villarreal and Lemus left the gas station and drove onto Atlantic Boulevard, where appellant and Delgado entered the car. According to Lemus, Delgado said, "I got him. He was screaming."

A video recording from the Shell station's security camera was played for the jury. The recording shows appellant (wearing a white T-shirt) step outside the car while Villarreal and Lemus enter the station to pay for gas. As Villarreal pumps gas, Lemus reenters the car. Appellant then points toward the street; Delgado (wearing a dark T-shirt) leaves the car, and the pair crosses Atlantic Boulevard. After a few moments, Lemus also steps out of the car, walks in front of it, and looks toward Atlantic Boulevard. Lemus soon gestures to Villarreal, who stops pumping gas, and the car leaves the gas station.

Ramon Portillo and his son, Fernando Tovar, resided close to Mora on 57th Street. At 3:00 p.m. on August 13, 2009, while Portillo and Tovar were in their living room, they saw Mora walk west on 57th Street toward a street vendor and return with a slurpee or a shaved iced cone. After Mora moved past their house, they noticed Delgado, who appeared to be following Mora. Delgado stopped, drew a gun, fired several shots, and walked away.[4]

---

[4] During the police investigation, Portillo identified Delgado as the shooter in a photographic lineup. Although Tovar also identified Delgado as the shooter in a photographic lineup, Tovar initially testified at the preliminary hearing that he could not identify the shooter. At trial, Tovar attributed his failure to identify Delgado to a fear of

*(Fn. continued on next page.)*

5

At approximately 3:00 p.m., Robert Rodriguez, who also lived near Mora, left his house and walked west toward the convenience store in the Valero service station on Atlantic Boulevard. As he did so, he saw Mora, who was walking east, carrying a shaved ice cone. Two young men also passed him moving east, one wearing a white T-shirt, and the other a black T-shirt. When Rodriguez entered the convenience store, he heard gunshots and decided to return to his house. As he hurried back to his house, he saw the two young men running west toward Atlantic Boulevard. He then discovered Mora on the ground.

Mora died of fatal gunshot wounds.

B. *Defense Evidence*

Only Delgado presented evidence on his behalf. Raul Hernandez, an air conditioning and refrigeration technician, testified that during August 2009, he employed Delgado as a helper, although he acknowledged that Delgado missed work on two days. He was unsure whether Delgado appeared for work on August 13, 2009.

**DISCUSSION**

Appellant contends (1) there was insufficient evidence to support the gang enhancement, (2) the trial court erred in admitting Lemus's preliminary hearing testimony, (3) there was instructional error, and (4) the trial court imposed an incorrect sentence. As explained below, we find no reversible error, with the

reprisals against himself and his family. Tovar further stated that after the prosecutor arranged for his family to be relocated, he identified Delgado as the shooter during the preliminary hearing.

exception of certain sentencing defects that we may properly correct without a remand for resentencing.

A. *Sufficiency of the Evidence*

Appellant contends the gang enhancement fails for want of sufficient evidence. Generally, subdivision (b) of section 186.22 "imposes additional punishment when a defendant commits a felony for the benefit of, at the direction of, or in association with a criminal street gang. To establish that a group is a criminal street gang within the meaning of the statute, the People must prove: (1) the group is an ongoing association of three or more persons sharing a common name, identifying sign, or symbol; (2) one of the group's primary activities is the commission of one or more statutorily enumerated criminal offenses; and (3) the group's members must engage in, or have engaged in, a pattern of criminal gang activity. [Citations.]" (*People v. Duran* (2002) 97 Cal.App.4th 1448, 1457.) Appellant maintains the prosecution made an inadequate showing regarding the Maywood Locos' "primary activities." As explained below, we reject this contention.[5]

---

[5]    "'The proper test for determining a claim of insufficiency of evidence in a criminal case is whether, on the entire record, a rational trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.] On appeal, we must view the evidence in the light most favorable to the People and must presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citation.] [¶] Although we must ensure the evidence is reasonable, credible, and of solid value, nonetheless it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts on which that determination depends. [Citation.] Thus, if the verdict is supported by substantial evidence, we must accord due deference to the trier of fact and not substitute our evaluation of a witness's credibility for that of the fact finder. [Citations.]' [Citation.]" (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206.)

7

"The phrase 'primary activities,' as used in the gang statute, implies that the commission of one or more of the statutorily enumerated crimes is one of the group's 'chief' or 'principal' occupations." (*People v. Sengpadychith* (2001) 26 Cal.4th 316, 323 (*Sengpadychith*).) Among the crimes enumerated in the statute are murder, attempted murder, assault with deadly weapons or force likely to produce great bodily injury, burglary, robbery, gun possession, sales of narcotics, and felony extortion. (§ 186.22, subds. (e)(1), (e)(2), (e)(3), (e)(4), (e)(19), (e)(23), (e)(31); see *People v. Vy* (2004) 122 Cal.App.4th 1209, 1226 [attempted commission of enumerated crimes also falls under gang statute].) Evidence that gang's members have "consistently and repeatedly" committed criminal activity enumerated in the gang statute is sufficient to establish the gang's primary activities. (*Sengpadychith*, *supra*, 26 Cal.4th at p. 324, italics omitted.) In contrast, evidence of the "occasional" commission of such crimes is insufficient. (*Ibid*.) To make the required showing, the prosecution may rely on evidence of the crimes charged against the defendant, evidence of crimes committed by other gang members, and expert testimony regarding the gang's activities. (*Id*. at pp. 323-324.)

Here, the key evidence regarding the Maywood Locos' primary activities was provided by Deputy Sheriff Serrata, who stated that he was familiar with the gang because he had lived near the gang's area, served with the Maywood Police Department, and worked in a unit that investigated the Maywood Locos. He testified as follows:

"[Prosecutor]. Are you familiar with the types of crimes that Maywood Locos gang members participate in?

"[Serrata]. Yes, sir.

"[Prosecutor]. Can you describe what those are based on your experience?

8

"[Serrata]. Auto theft, burglary, robbery, assault, assault with deadly weapons, attempted murder and murder[,] and narcotics sales.

"[Prosecutor]. What narcotics?

"[Serrata]. Mostly marijuana and methamphetamine. [¶] They're also -- also extortion."

In addition, he identified two gang members who had been convicted of attempted murder, murder, and narcotics sales.

Serrata further testified that the Maywood Locos and the K.W.S. gang became rivals in the late 1980's or early 1990's. The hostilities between the two gangs rapidly escalated from fistfights to shootings. According to Serrata, at the time of Mora's murder, "there were so many shootings back and forth that gang members were even afraid to walk around in their own area, much less going into rival gang territory." He also testified that members of the Maywood Locos earned respect within their gang by "putting in work," which involved the commission of violent crimes against other gangs, including murder, attempted murder, and assault with a deadly weapon.

Although Serrata expressly stated that the Maywood Locos committed crimes listed in the gang statute, appellant contends his testimony was insufficient to establish the gang's primary activities, for purposes of the gang statute. We disagree. Viewed as a totality, Serrata's testimony, including his description of the warfare between the Maywood Locos gang and its rival, showed that Maywood Locos "consistently and repeatedly" engaged in crimes enumerated in the statute (*Sengpadychith*, *supra*, 26 Cal.4th at p. 324, italics omitted).

Appellant's reliance on *In re Alexander L.* (2007) 149 Cal.App.4th 605 is misplaced. There, a deputy sheriff presented as an expert witness testified that a specified gang had committed crimes enumerated in the statute, but offered no

9

testimony regarding the circumstances of the crimes or how he knew of them. (*Id.* at pp. 611-612.) The appellate court concluded that the testimony did not constitute substantial evidence regarding the gang's primary activities, as no foundation had been laid for the deputy sheriff's conclusory description of the gang's criminal activity. (*Id.* at pp. 611-614.) That is not the case here: Serrata explained the basis of his knowledge of the Maywood Locos' crimes, and testified that they repeatedly engaged in enumerated offenses over a lengthy period. In sum, there was sufficient evidence to support the gang enhancement.

### B. *Lemus's Preliminary Hearing Testimony*

Appellant contends the trial court erred in ruling that Lemus's preliminary hearing testimony was admissible because she was unavailable as a witness. He maintains that admitting the testimony contravened his confrontation rights under the California and United States Constitutions, arguing that the prosecution failed to show due diligence in attempting to procure Lemus's appearance as a witness, and that he lacked an adequate opportunity to cross-examine Lemus during the preliminary hearing.

### 1. *Governing Law*

Our inquiry into appellant's contentions follows established principles. "The confrontation clauses of both the federal and state Constitutions guarantee a criminal defendant the right to confront the prosecution's witnesses. (U.S. Const., 6th Amend.; Cal. Const., art. I, § 15.) That right is not absolute, however. An exception exists when a witness is unavailable and, at a previous court proceeding against the same defendant, has given testimony that was subject to cross-examination. Under federal constitutional law, such testimony is admissible if the

10

prosecution shows it made 'a good-faith effort' to obtain the presence of the witness at trial. (*Barber v. Page* (1968) 390 U.S. 719, 725; accord, *Ohio v. Roberts* (1980) 448 U.S. 56, 74[, reversed on other grounds in *Crawford v. Washington* (2004) 541 U.S. 36, 62].)  California allows introduction of the witness's prior recorded testimony if the prosecution has used 'reasonable diligence' (often referred to as due diligence) in its unsuccessful efforts to locate the missing witness.  [Citation.] . . .)"  (*People v. Cromer* (2001) 24 Cal.4th 889, 892 (*Cromer*); Evid. Code, §§ 240, subd. (a)(5), 1291.)[6]

Generally, "'[w]hat constitutes due diligence to secure the presence of a witness depends upon the facts of the individual case.  [Citation.]  The term is incapable of a mechanical definition.  It has been said that the word 'diligence' connotes persevering application, untiring efforts in good earnest, efforts of a substantial character.  [Citation.]  The totality of efforts of the proponent to achieve [the] presence of the witness must be considered by the court.  Prior decisions have taken into consideration not only the character of the proponent's affirmative efforts but such matters as whether he reasonably believed prior to trial that the witness would appear willingly and therefore did not subpoena him when

---

[6] Subdivision (a)(5) of Evidence Code 240 provides that a declarant is unavailable as a witness if the declarant is "[a]bsent from the hearing and the proponent of his or her statement has exercised reasonable diligence but has been unable to procure his or her attendance by the court's process."

Subdivision (a) of Evidence Code section 1291 provides:  "Evidence of former testimony is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and:  [¶]  (1)  The former testimony is offered against a person who offered it in evidence in his own behalf on the former occasion or against the successor in interest of such person; or [¶] (2)  The party against whom the former testimony is offered was a party to the action or proceeding in which the testimony was given and had the right and opportunity to cross-examine the declarant with an interest and motive similar to that which he has at the hearing."

he was available [citation], whether the search was timely begun, and whether the witness would have been produced if reasonable diligence had been exercised [citation].' [Citation.]" (*People v. Sanders* (1995) 11 Cal.4th 475, 523.)

The trial court's ruling regarding due diligence presents a mixed question of fact and law. (*Cromer*, *supra*, 24 Cal.4th at p. 893.) To the extent the trial court resolved conflicts in the evidence regarding historical facts, we review the trial court's findings for the existence of substantial evidence. (*Id*. at pp. 894, 900-902.) To the extent the trial court concluded that the historical facts "amount[ed] to due diligence by the prosecution," we review the determination de novo. (*Id*. at pp. 900-901.)

### 2. *Evidence and Ruling*

Lemus was fifteen years old at the time of Mora's murder. When interviewed by Los Angeles County Sheriff's Department Detective Brian Schoonmaker, she initially denied any knowledge of the crime, but soon provided an account of it. Schoonmaker later served her with a subpoena to appear at the preliminary hearing.

On July 2, 2010, at the beginning of the preliminary hearing, appellant and some of his co-defendants asked for a continuance, arguing, inter alia, that they needed additional time to explore whether Lemus suffered from mental illness. In opposing the request, the prosecutor stated that Lemus was present and was "going to testify, either on her own or with a grant of immunity." He also expressed "serious doubts" whether she would reappear following a continuance, even if ordered to do so. After the trial court denied the continuance, Lemus asserted her Fifth Amendment right against self-incrimination, received a grant of immunity, and testified regarding Mora's murder.

12

On July 6, 2010, Lemus reappeared at the preliminary hearing to continue her testimony. Appellant and his co-defendants requested an order to compel Lemus to enter into a written undertaking to appear at trial (§ 1332), pointing to the prosecutor's earlier remarks regarding her potential reluctance to testify. The prosecutor opposed the request, arguing that his concerns regarding Lemus were common in gang-related cases, and did not constitute a basis for a written undertaking.

On the same date, before Lemus resumed her testimony, the prosecutor also told the trial court that members of the courtroom audience had made hostile gestures to Lemus while she testified during the prior session. Lemus also informed the court that she felt "[t]hreatened." Following an inquiry, the court excluded two persons from the courtroom and ordered Lemus's foster father, who had accompanied her to the hearing, to stay with her throughout the proceedings. Lemus then continued her testimony, which she completed on July 7, 2010. Shortly afterward, appellant and his co-appellants withdrew their request for a written undertaking to secure Lemus's appearance at trial, stating that they accepted the prosecutor's representation that "the concerns he had [were] . . . common in every gang case."

During the preliminary hearing, Lemus described the events surrounding Mora's murder. In addition, during cross-examination, she testified that she had been diagnosed as bipolar at an early age, and took medication for the condition. In May 2009, after her mother was arrested, she ran away to avoid placement in a foster home. At the time of Mora's murder, she was "living on the street," using drugs and drinking alcohol, and not taking her prescribed medication. She further testified that she felt some "pressure" when the investigating officers interviewed her, but denied that they promised to let her go if she described the crime.

13

According to Lemus, she began living in a foster home in January 2010, and was taking her prescribed medication at the time she testified.

Appellant's trial began on June 20, 2011. Prior to the selection of the jury, the prosecutor requested a determination that Lemus was unavailable as a witness, for purposes of admitting her preliminary hearing testimony. The sole witness to testify at the due diligence hearing was Detective Schoonmaker. According to Schoonmaker, Lemus was cooperative during the investigation of Mora's murder, and complied with the subpoena to appear at the preliminary hearing. Lemus's foster father brought her to the preliminary hearing, and she was "friendly and cooperative" while she testified.

Schoonmaker further testified that on June 7, 2011, he sought to serve a subpoena on Lemus. He phoned Lemus's foster parents, who said that she had run away several weeks earlier, while meeting with a social worker. The social worker told Schoonmaker that on April 28, 2011, she authorized a warrant for Lemus's detention. Schoonmaker unsuccessfully tried to contact Lemus on her cellphone. He also talked to Lemus's mother, aunt, and sister, none of whom had seen Lemus within the previous month. In addition, he checked Los Angeles County custody facilities, juvenile halls, morgue, coroner's office, and hospitals, as well as the United States Postal Service and the Department of Motor Vehicles address database, all to no avail.

During cross-examination, Schoonmaker testified that he did not recall Lemus's preliminary hearing testimony regarding her need for medication, use of illegal drugs, and status as a runaway at the time of Mora's murder, but remembered that she was under the care of a psychiatrist. He further stated that he had no reason to believe that she would not continue living in a foster home after the preliminary hearing, as she was supervised by a social worker.

14

In finding the existence of due diligence, the trial court stated that although Lemus had "problems" when Mora was murdered, her situation changed after that event: she cooperated during the criminal investigation, was placed in a foster home, and appeared to have a good relationship with Schoonmaker and her foster parents. The court also noted that Lemus complied with the subpoena and completed her preliminary hearing testimony despite threats to her. The court thus found that Schoonmaker reasonably believed that Lemus would not flee before trial. The court further concluded that Schoonmaker had done everything he could to locate her, and noted that even if Schoonmaker had tried to find her as early as April 28, 2011, he would have been unable to do so.

### 3. *Due Diligence*

Because the historical facts are not in dispute, we confront an issue of law, namely, whether the prosecution exercised due diligence in trying to secure Lemus's presence at trial. Generally, the prosecution is obliged only to use "reasonable efforts" to procure a witness. (*People v. Cummings* (1993) 4 Cal.4th 1233, 1298.) Because appellant does not dispute that Schoonmaker made reasonable efforts to locate Lemus in June 2011, our focus is on whether the prosecution was required to monitor Lemus or prevent her from fleeing prior to trial. (See *People v. Wilson* (2005) 36 Cal.4th 309, 341-342 [detective's two-day search for missing witness encompassing last known address and police, county, and state records was sufficient to establish witness's unavailability].) Absent special circumstances, the prosecution is subject to no such requirement. (*People v. Fuiava* (2012) 53 Cal.4th 622, 676-677 (*Fuiava*).) Our Supreme Court has explained: "[W]e could not properly impose upon the People an obligation to keep 'periodic tabs' on every material witness in a criminal case, for the

administrative burdens of doing so would be prohibitive.  Moreover, it is unclear what effective and reasonable controls the People could impose upon a witness who plans to . . . simply 'disappear,' long before a trial date is set." (*People v. Hovey* (1988) 44 Cal.3d 543, 564.)

Pointing to the prosecutor's remarks at the preliminary hearing regarding Lemus's risk of flight, appellant maintains that the prosecution was obliged to monitor Lemus prior to the trial.  We disagree.  In *Fuiava*, a witness testified at the preliminary hearing that she saw the defendant fleeing from a gang-related shooting.  (*Fuiava, supra,* 53 Cal.4th at p. 676.)  She also stated that although she initially had been fearful to testify, she had moved her residence prior to the preliminary hearing with the assistance of the sheriff's department.  (*Ibid*.)  Later, two weeks before the trial, a detective tried to serve her with a subpoena, but discovered that she had disappeared.  (*Id*. at pp. 675-676.)  On appeal, the defendant asserted that the witness's preliminary hearing testimony obliged the prosecution to "ke[ep] tabs" on her.  (*Id*. at p. 676.)  In rejecting the contention, our Supreme Court observed that measures had apparently been taken to protect her before the preliminary hearing, and that her testimony was not critical to the prosecution's case.  (*Id*. at pp. 676-677.)

Here, as in *Fuiava*, the grounds for suspecting that Lemus might disappear before the trial appeared to be resolved by the time she completed her testimony at the preliminary hearing.  She was then living in a foster home and taking her medication, seemed to have a good relationship with her foster parents and Detective Schoonmaker, and was under the supervision of a social worker; in addition, she complied with the subpoena, acquired immunity from prosecution, and repeatedly appeared at the preliminary hearing, despite threats to her safety.  Furthermore, Lemus's testimony was not critical to the prosecution case, as it was

16

cumulative of Villarreal's testimony. We therefore conclude that the prosecution was not required to monitor her or take other steps to secure her presence at trial.

*People v. Louis* (1986) 42 Cal.3d 969 (*Louis*), disapproved on another ground in *People v. Mickey* (1991) 54 Cal.3d 612, 672, fn. 9, upon which appellant relies, is distinguishable. There, the prosecutor in a murder case permitted his key witness, who was then in custody, to be released on his own recognizance over a weekend, despite the witness's lengthy criminal history and habitual failure to appear in court. (*Louis, supra,* at pp. 989-900.) When the witness disappeared while released, the trial court permitted the prosecutor to present the witness's preliminary hearing testimony at trial. (*Id*. at p. 981.) Our Supreme Court concluded that the prosecution failed to show due diligence because the witness "was a critical prosecution witness, and was known to be both unreliable and of suspect credibility." (*Id*. at p. 991.) As explained above, that is not the case here. In sum, the trial court correctly determined the prosecution had exercised due diligence in attempting to secure Lemus's presence as a witness at trial.

### 4. *Cross-Examination*

Appellant also contends that his counsel's cross-examination of Lemus during the preliminary hearing was inadequate, and thus the admission of her testimony contravened Evidence Code section 1291 and the confrontation clauses of the United States and California Constitutions. We disagree.

As our Supreme Court has explained, "[a]dmission of the former testimony of an unavailable witness is permitted under Evidence Code section 1291 and does not offend the confrontation clauses of the federal or state Constitutions -- not because the opportunity to cross-examine the witness at the preliminary hearing is

17

considered an exact substitute for the right of cross-examination at trial [citation], but because the interests of justice are deemed served by a balancing of the defendant's right to effective cross-examination against the public's interest in effective prosecution. [Citations.]" (*People v. Zapien* (1993) 4 Cal.4th 929, 975; accord, *People v. Carter* (2005) 36 Cal.4th 1114, 1172-1173.) The prior testimony is admissible if defense counsel's motives in cross-examining the witness at the preliminary hearing were similar to those applicable at trial (*People v. Carter*, *supra*, 36 Cal.4th at p. 1173), and there was an adequate opportunity to cross-examine the witness, regardless of whether the defendant "'availed himself fully of that opportunity'" (*People v. Wilson, supra,* 36 Cal.4th at p. 346, quoting *People v. Zapien*, *supra*, 4 Cal.4th at p. 975).

Those requirements were satisfied here. The motives underlying the cross-examination of Lemus at the preliminary hearing closely resembled appellant's objectives at trial, namely, to discredit the materially similar accounts of Mora's murder provided by Lemus and Villarreal. During the preliminary hearing, appellant's counsel and his co-defendants' counsel cross-examined Lemus on matters related to her credibility, including her mental illness, status as a runaway at the time of Mora's murder, drug and alcohol use, and cooperation with investigating detectives and the prosecution. Nor was appellant denied an adequate opportunity to cross-examine Lemus at the preliminary hearing. Although Lemus initially asserted her right against self-incrimination under the Fifth Amendment, she received immunity from prosecution and complied with the trial court's order to answer questions.

Pointing to *Louis*, *supra*, 42 Cal.3d 969, appellant argues that he did not have "the same right and opportunity to cross-examine [Lemus] with an interest and motive similar to those at trial." We reject this contention. In *Louis*, our

18

Supreme Court expressed "some doubt" that the witness who disappeared after the preliminary hearing had been cross-examined with "an interest and motive similar to those [the defendant] had at trial," noting, inter alia, that the magistrate who conducted the preliminary hearing imposed limitations on the cross-examination. (*Id*. at p. 990.) However, because the Supreme Court expressly declined to decide whether the cross-examination was adequate (*ibid*), its remarks provide us with little or no guidance regarding that issue. (See *Curtis T. v. County of Los Angeles* (2004) 123 Cal.App.4th 1405, 1418 [Supreme Court's expression of "serious reservations" regarding rule offers little assistance regarding rule's correct application].) Furthermore, *Louis* is factually distinguishable, as the cross-examination of Lemus was not limited during the preliminary hearing. In sum, her preliminary hearing testimony was properly admitted.

### C. *Instructions*

Appellant contends the trial court incorrectly instructed the jury with former CALCRIM No. 400, which concerns aider and abettor liability, and with CALCRIM No. 357, which concerns adoptive admissions. As explained below, we find no reversible error.

#### 1. *Former CALCRIM No. 400*

Appellant contends the trial court erred in instructing the jury with a modified version of former CALCRIM No. 400, which stated: "A person may be guilty of a crime in three ways. One, he may have directly committed the crime. I will call that person the perpetrator. Two, he . . . may have aided and abetted a perpetrator[] who directly committed the crime. Three, he may have conspired with another person or person[s] to commit the crime. A person is *equally guilty*

19

*of the crime* whether he . . . committed it personally, or aided and abetted the perpetrator who committed it, or conspired with another person who committed it." (Italics added.) As explained below, he has forfeited his contention of error.

Pointing to the italicized phrase, appellant maintains that the instruction incorrectly informed the jury that it must find him guilty of first degree murder if he aided and abetted Delgado's commission of first degree murder. "Generally, a person who is found to have aided another person to commit a crime is 'equally guilty' of that crime. [Citations.]" (*People v. Lopez* (2011) 198 Cal.App.4th 1106, 1118 (*Lopez*) italics omitted.) However, in certain circumstances, the aider and abettor "may be found guilty of a greater or lesser crime than the perpetrator" (*Lopez*, *supra*, 198 Cal.App.4th at p. 1118), as an aider and abettor's guilt "is based on a combination of the direct perpetrator's acts and the aider and abettor's *own* acts and *own* mental state" (*People v. McCoy* (2001) 25 Cal.4th 1111, 1117).

Appellant asserts that the requisite circumstances are present here. The jury received instructions encompassing first degree murder and second degree murder based on "implied malice," that is, a killing resulting from "an act dangerous to human life" performed "in conscious disregard of life" (*People v. Thomas* (2012) 53 Cal.4th 771, 815). In view of these instructions, appellant contends that the jury could have found that Delgado's crime was more serious than his own, arguing that the evidence at trial supported the inference that while Delgado planned to kill Mora, appellant intended simply to assist in some act that endangered Mora. Appellant thus maintains that former CALCRIM No. 400 improperly deterred the jury from finding that he committed only second degree "implied malice" murder.

We conclude that appellant failed to preserve his contention for appeal. "Generally, a party forfeits any challenge to a jury instruction that was correct in

20

law and responsive to the evidence if the party fails to object in the trial court."
(*People v. Franco* (2009) 180 Cal.App.4th 713, 719 (*Franco*).)  There is no
dispute that appellant's defense counsel raised no objection to the portion of
former CALCRIM No. 400 italicized above.  At least three appellate courts have
concluded that the failure to object to former CALCRIM No. 400 and propose
clarifying terms works a forfeiture, reasoning that the instruction is generally an
accurate statement of law, although potentially misleading in some circumstances.
(*People v. Loza* (2012) 207 Cal.App.4th 332, 350; *Lopez*, *supra*, 198 Cal.App.4th
at pp. 1118-1119; *People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1163.)[7]

Moreover, we would reject appellant's contention on the merits were we to
address it.  Generally, the adequacy of any instruction given must be judged in the
context of all the instructions.  (5 Witkin & Epstein, Cal. Criminal Law (3d ed.
2000) Criminal Trial, § 663, pp. 953-954.)  Thus, an instruction is not assessed in
isolation, but is properly viewed in the context of the overall charge (*People v.
Reliford* (2003) 29 Cal.4th 1007, 1013) and the prosecutor's closing arguments
(*People v. Cain* (1995) 10 Cal.4th 1, 37).  When an instruction is potentially
ambiguous or misleading, the instruction is not error unless there is a reasonable
likelihood that the jurors misunderstood or misapplied the pertinent instruction.
(*People v. Reliford*, *supra*, 29 Cal.4th at p. 1013; *People v. Avena* (1996) 13
Cal.4th 394, 416-417.)

---

[7]    We recognize that in *People v. Nero* (2010) 181 Cal.App.4th 504, 518, the
appellate court stated that the reference to equality of guilt in former CALCRIM No. 400
and its predecessor, CALJIC No. 3.00, can be misleading "even in unexceptional
circumstances."  However, it is unnecessary for us to examine the extent to which *Nero*
may relieve a defendant of the duty to object to former CALCRIM No. 400 to avoid a
forfeiture, as we conclude below that the instruction was not misleading under the
circumstances of this case.

Here, the record establishes that the jury was instructed that it must assess appellant's liability for Mora's murder independently of Delgado's liability for that crime. In addition to former CALCRIM No. 400, the jury received CALCRIM No. 401, which stated in pertinent part: "To prove that the defendant is guilty of a crime based on aiding and abetting that crime, the People must prove that: [¶] 1. The perpetrator committed the crime; [¶] 2. The defendant knew that the perpetrator intended to commit the crime; [¶] 3. Before or during the commission of the crime, the defendant intended to aid and abet the perpetrator in committing the crime; [¶] AND [¶] 4. The defendant's words or conduct did in fact aid and abet the perpetrator's commission of the crime. [¶] Someone aids and abets a crime if he or she knows of the perpetrator's unlawful purpose and he or she *specifically intends* to, and does in fact, aid, facilitate, promote, encourage, or instigate the perpetrator's commission of *that crime*." (Italics added.)[8]

During closing arguments, the prosecutor also emphasized that the jury must evaluate appellant's liability for Mora's murder independently of Delgado's liability. During the opening portion of his closing argument, the prosecutor argued that Delgado was the direct perpetrator of Mora's murder, and that appellant was liable for the murder as an aider and abettor and co-conspirator.[9] Regarding Delgado, the prosecutor asserted that in shooting Mora, he "accomplished what [he] set out to do." Regarding appellant and Garcia, the

---

[8] The jury was not instructed regarding the "natural and probable consequence doctrines," which extends the liability of an aider and abettor to "'any other offense that was a "natural and probable consequence" of the crime aided and abetted'" (*People v. McCoy*, *supra*, 25 Cal.4th at p 1117).

[9] The jury received CALCRIM Nos. 416, 418, 419, and 420, which describe the elements of liability for a crime as a conspirator.

22

prosecutor told the jury that it must "look at each defendant . . . *individually*"; in addition, he advised the jury not to speculate regarding their motivations, but to draw "reasonable conclusions" from their conduct, as disclosed by the gas station video recording and other evidence. (Italics added.) The prosecutor noted that appellant repeatedly looked across Atlantic Boulevard while talking to Delgado and Garcia, arranged for a pick up by Villarreal, and then accompanied Delgado, whose gun had been retrieved prior to the shooting. He urged the jury to conclude that appellant and Delgado "work[ed] together and shared a purpose and . . . fulfilled that purpose in killing . . . Mora."

In reply, defense counsel maintained that appellant's state of mind was crucial to his liability as an aider and abettor, and that the evidence did not show that appellant harbored the "specific intent" to kill Mora. During the final portion of his closing argument, the prosecutor responded to the challenge that "there [was] no intent shown," arguing, "You know what [appellant] is thinking by what he does."

In view of the record, we discern no reasonable possibility that former CALCRIM No. 400 misled the jury with respect to appellant's liability for first degree murder as an aider and abettor. The instructions and the prosecutor's arguments, viewed in conjunction, informed the jury that if Delgado committed first degree murder, Hidalgo was also guilty of first degree murder only if an individualized analysis of the evidence showed that he shared Delgado's intent to kill Mora. Furthermore, the record discloses no sign that former CALCRIM No.

23

400 confused the jury, as it requested no clarification regarding that instruction. In sum, appellant has failed to show reversible error.[10]

### 2. *Adoptive Admission Instruction*

Appellant contends the trial court erred in instructing the jury with a modified version of CALCRIM No. 357, which described the circumstances under which the jury was permitted to consider an out-of-court statement as an adoptive admission. As explained below, we discern no reversible error.

Generally, "[a] statement by someone other than the defendant is admissible as an adoptive admission if the defendant 'with knowledge of the content thereof, has by words or other conduct manifested his adoption [of] or his belief in its truth.' [Citations.] [¶] In determining whether a statement is admissible as an adoptive admission, a trial court must first decide whether there is evidence sufficient to sustain a finding that: (a) the defendant heard and understood the statement under circumstances that normally would call for a response; and (b) by words or conduct, the defendant adopted the statement as true. [Citations.]" (*People v. Davis* (2005) 36 Cal.4th 510, 535.) When the trial court determines that there is sufficient evidence of an adoptive admission, "whether [the] defendant's conduct actually constituted an adoptive admission becomes a question for the jury to decide." (*People v. Edelbacher* (1989) 47 Cal.3d 983, 1011.)

---

[10] For similar reasons, we reject appellant's related contention that his defense counsel rendered ineffective assistance by failing to object to former CALCRIM No. 400, as there is no reasonable likelihood that the trial's outcome would have been more favorable to appellant had his counsel done so. (*People v. Jennings* (1991) 53 Cal.3d 334, 357.)

24

Here, Lemus testified that when appellant and Delgado returned to Villarreal's car, appellant remained silent when Delgado asserted, "I got him. He was screaming." Similarly, Villarreal testified that appellant said nothing when Delgado said, "I got him," and he "fell to the floor screaming." In view of this testimony, the trial court decided to instruct the jury regarding adoptive admissions.[11]

At the threshold, respondent argues that appellant forfeited his contention by failing to raise it before the trial court. However, a defendant need not assert an objection to preserve a contention of instructional error when the error affects the defendant's substantial rights. (*Franco*, *supra*, 180 Cal.App.4th at p. 719.) For purposes of this exception to the requirement for an objection, "[i]nstructional error affects a defendant's substantial rights if the error was prejudicial under the applicable standard for determining harmless error." (*Id*. at p. 720.) Under the exception, "'"[a]scertaining whether claimed instructional error affected the substantial rights of the defendant necessarily requires an examination of the merits of the claim -- at least to the extent of ascertaining whether the asserted error would result in prejudice if error it was." [Citation.]'" (*Id*. at p. 719.)

---

[11] The trial court instructed the jury as follows: "If you conclude that someone made a statement outside of court that accused any of the defendants of the crime or tended to connect him with the commission of the crime and that defendant did not deny it, at the time you must decide whether each of the following is true: [¶] 1. The statement was made to that defendant or made in his presence; [¶] 2. That defendant heard and understood the statement; [¶] 3. That defendant would, under all the circumstances, naturally have denied the statement at the time if he thought it was not true; AND [¶] 4. That defendant could have denied it at the time but did not. [¶] If you decide that all of these requirements have been met, you may conclude that that defendant admitted the statement was true. [¶] If you decide that any of these requirements has not been met, you must not consider either the statement or that defendant's response for any purpose. [¶] *(Fn. continued on next page.)*

Because we discern instructional error, we address appellant's contention on the merits to determine whether there was an impairment of his substantial rights. (See *People v. Anderson* (2007) 152 Cal.App.4th 919, 927.)

We find dispositive guidance regarding the propriety of the instruction from *People v. Carter* (2003) 30 Cal.4th 1166. There, the defendant, a gang member, was charged with several crimes, including the murder and attempted murder of two men. (*Id*. at pp. 1179, 1181-1184, 1194.) At trial, the prosecution submitted evidence that the defendant and two members of a related gang attacked the men with firearms. (*Id*. at pp. 1179-1182, 1194.) In addition, the prosecution was permitted to present evidence from an acquaintance of the defendant regarding a conversation involving the acquaintance, the defendant, and one of the accomplices. (*Id*. at pp. 1184-1185.) During the conversation, the accomplice described his role in the shooting, but did not mention that the defendant was involved in the shooting. (*Ibid.*) Although the defendant was present, he never attempted to deny or challenge the accomplice's remarks. (*Id*. at pp. 1184-1185.) In concluding that the conversation was inadmissible, our Supreme Court stated: "[A] fundamental problem with treating as an adoptive admission the defendant's failure to contradict [the accomplice's] recounting of the . . . offenses is that nothing in [his] remarks referred to [the] defendant or accused him of anything. There being, in essence, nothing for [the] defendant to deny, a condition of the hearsay exception for adoptive admissions did not exist, and the trial court therefore erred in concluding [the accomplice's] remarks were admissible as adoptive admissions." (*Id*. at pp. 1196-1197.)

---

You must not consider this evidence in determining the guilt of any other defendant unless he made the statement."

26

We reach the same conclusion here. Delgado's remarks focused exclusively on his own conduct, and reported facts established as true by other evidence. According to the testimony from the Portillos and Robert Rodriguez, Delgado shot Mora, who was discovered lying on the ground. As Delgado's remarks contained nothing to prompt a denial from appellant, they were incorrectly admitted for the jury's consideration as adoptive admissions.

Pointing to *People v. Fauber* (1992) 2 Cal.4th 792, 852-853, respondent maintains that Delgado's remarks were admissible as adoptive admissions by appellant even though they contained no direct accusation against him. We disagree. In *Fauber*, a witness testified that she overheard the defendant and two accomplices discussing how to dispose of the remains and belongings of a person they had murdered and robbed. (*Id.* at p. 851.) Although the witness heard all three men speaking, she could not identify who made any particular remark. (*Ibid.*) On appeal, the defendant maintained that the remarks were inadmissible against him as adoptive admissions "because they were not accusatory statements and called for no particular reply." (*Id.* at p. 852.) In rejecting the contention, our Supreme Court stated: "The circumstances afforded [the] defendant the opportunity to deny responsibility, to refuse to participate, or otherwise to dissociate himself from the planned activity; he did not do so." (*Ibid.*) In contrast, no such circumstances are present here. As Delgado's remarks referred to his own past conduct, they did not call for any response from appellant.

However, the error regarding Delgado's remarks was harmless, regardless of whether it is examined for prejudice under the test in *People v. Watson* (1956) 46 Cal.2d 818, or the more stringent beyond-a-reasonable-doubt test for federal constitutional error found in *Chapman v. California* (1967) 386 U.S. 18. As noted above, the facts asserted in the remarks were independently proved by other

evidence admissible against appellant. Furthermore, appellant's state of mind regarding Mora's murder was established by his conduct in connection with the crime, even though the prosecutor's closing argument also gave some weight to appellant's silence in response to Delgado's remarks. The evidence at trial conclusively showed that appellant talked with Delgado and Garcia regarding the "dummy," arranged a pick up with Villarreal, and crossed Atlantic Boulevard with Delgado, whose gun had been retrieved from Garcia's house. In addition, there was expert testimony that entering into K.W.S. territory to shoot its members was a method by which Maywood Locos "put in work" for their gang. Under the circumstances, there is no reasonable doubt that appellant would not have achieved a more favorable outcome had the jury been correctly instructed. Accordingly, the error was not prejudicial.[12]

D. *Sentencing*

Appellant contends the trial court erred in setting his minimum parole eligibility period and ordering a parole revocation fine. As explained below, we conclude that appellant's sentence contains defects that we may correct on appeal.

1. *Minimum Parole Eligibility Period*

Appellant maintains the trial court improperly imposed a 15-year minimum parole eligibility period pursuant to section 186.22, subdivision (b)(5). We agree. In sentencing appellant, the trial court imposed a term of 25 years to life regarding

---

[12] Because the error was harmless, we also reject appellant's contention that his defense counsel rendered ineffective assistance by failing to object to CALCRIM No. 357.

28

his conviction for first degree murder, and a consecutive term of 25 years to life regarding the gun use finding under section 12022.53, subdivision (d) and (e). As explained in *People v. Salas* (2001) 89 Cal.App.4th 1275, 1281-1282 (*Salas*), when a defendant in a gang-related case is subject to a gun use enhancement under subdivisions (d) and (e)(1) of section 12022.53, but did not personally use or discharge the gun, subdivision (e)(2) of section 12022.53 prevents the imposition of the 15-year minimum parole eligibility period under 186.22, subdivision (b)(5). Here, the jury did not find that appellant personally used a gun; it found only that a principal in a gang-related case used a gun and caused great bodily injury (§ 12022.53, subds. (d), (e)(1)). For this reason, the trial court incorrectly determined appellant's minimum parole eligibility period. Respondent concedes there was error.

The remaining question concerns appellant's proper minimum parole eligibility period. Subdivision (a) of section 3046 provides: "No prisoner imprisoned under a life sentence may be paroled until he or she has served the greater of the following: [¶] (1) A term of at least seven calendar years. [¶] (2) A term as established pursuant to any other provision of law that establishes a minimum term or minimum period of confinement under a life sentence *before eligibility for parole*." (Italics added.) Section 190, which establishes a term of 25 years to life for first degree murder, states that a person so sentenced "shall not be released on parole prior to serving the minimum term of confinement" (§ 190, subds. (a), (e), and is ineligible for a custody credit reduction of the minimum term (*People v. Hutchins* (2001) 90 Cal.App.4th 1308, 1315-1316). In contrast, section 12022.53 contains no such provisions. Accordingly, appellant is properly subject to a 25-year minimum parole eligibility period under section 190, subdivisions (a), (e). (See *Salas*, *supra*, 89 Cal.App.4th at pp. 1277-1283 [defendant's minimum

29

parole eligibility period determined solely by life term for defendant's conviction for attempted murder, without reference to 25-years-to-life enhancement imposed under section 12022.53, subdivision (d)].) Because the error here resulted in an unauthorized sentence, we shall modify the sentence to correct it. (*People v. Smith* (2001) 24 Cal.4th 849, 852; *Salas*, *supra*, at p. 1283.)


## 2. *Parole Revocation Fine*

Appellant contends the trial court erred in imposing a $200 parole revocation fine. Subdivision (c) of section 1202.45 provides that any such fine "shall be suspended unless the person's parole . . . is revoked." However, the court ordered the fine to be stayed "pending the successful completion of appeal, at which time it will become permanent." As respondent acknowledges, this was error. For the reasons explained above, we shall modify the sentence to correct it.

## DISPOSITION

The judgment is modified to reflect that appellant's minimum parole eligibility period is 25 years (§§ 190, subds. (a),(e), 3046), and that the $200 parole revocation fine is suspended unless his parole is revoked (§ 1202.45, subd. (c)). In all other respects, the judgment is affirmed. The superior court is directed to prepare an amended abstract of judgment to reflect the modifications to appellant's sentence, and forward a copy of the amended abstract of judgment to the California Department of Corrections and Rehabilitation.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

MANELLA, J.

We concur:

WILLHITE, Acting P. J.

SUZUKAWA, J.

31